UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| RICH & RICH PARTNERSHIP, | ) |
| Plaintiff, | ) Civil Action No. 08-436-ART |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| POETMAN RECORDS USA, INC., et al., | ) **& ORDER** |
| Defendants. | ) |

\*\*\* \*\*\* \*\*\* \*\*\*

The defendants, Poetman Records USA and Michael Johnathan (collectively "Poetman"), filed a motion to exclude the expert reports, declarations, and proffered testimony of Lisa M. Davis, an expert witness of the plaintiff, Rich & Rich Partnership ("Rich & Rich"). *See* R. 121. Rich & Rich responded to this motion, R. 135, and Poetman filed a reply, R. 139. For the reasons provided below, Poetman's motion to exclude is granted in part and denied in part.

## BACKGROUND

On August 14, 1998, Poetman agreed to market the plaintiff's album titled "The Kentucky Wildcat Basketball Fan Experience/True Blue" ("Rich & Rich album"). *See* R. 123, Ex. 1. Some of the songs on the album include sounds from University of Kentucky ("UK") basketball games and songs are from the UK Pep Band. *See* R. 18. The contract terminated on January 1, 2000. *Id.* ¶ 12. In 2003, Poetman produced an album—without Rich & Rich's involvement—that also had UK Pep Band music on it. R. 121 at 2. Rich & Rich filed suit in March 2008 and asserted various claims that stem from its contract with Poetman, including

breach of contract and breach of fiduciary duty. *See* R. 18 and R. 112.

To support its claims, Rich & Rich hired Lisa M. Davis ("Davis") to be an expert witness in this case. Davis provided her expert opinion in two reports. In preparation of her first report, dated January 2, 2009, she provided her opinion based on: the contract between Rich & Rich and Poetman, correspondence between the parties, and the allegations of this lawsuit. *See* R. 121, Ex. 2. She stated, among other things, that Poetman's failure to provide a written marketing plan for the 1999-2000 season was a "departure from the standard practice in the industry." On November 30, 2009, Davis supplemented her expert report. *See* R. 121, Ex. 3. In this supplement, she projected how many albums in her opinion Rich & Rich should have sold from 1998-2009. *Id.* These sales estimates were based on the "approximately three million basketball adults (fans) living in Kentucky." *Id.*

Poetman did not depose Davis before the close of discovery. Now, Poetman has moved to exclude Davis's reports, declarations, and proffered testimony. *See* R. 121. The Court held a *Daubert* hearing on Poetman's motion on April 29, 2010. R. 152. Davis testified as to her qualifications and the reliability of her methods in projecting Rich & Rich's sales.

## DISCUSSION

Poetman attacks Davis's opinion on two grounds: (1) she is not qualified and (2) her methods for calculating sales projections in the supplemental report are not reliable. While Davis is qualified, Rich & Rich has not shown that her methods in the supplemental report are reliable.

2

**I.      Qualified**

An expert can be qualified to assist the trier of fact to understand the evidence or to determine a fact in issue based on her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Court must make a "determination as to the proposed expert's qualifications." *Nemir v. Mitsubishi Motor Sales of Am., Inc.*, 6 F. App'x 266, 270 (6th Cir. 2001) (quoting *Morales v. Am. Honda Motor Co. Inc.*, 151 F.3d 500, 516 (6th Cir. 1998)). To make this determination, the Court must "investigate the competence a particular proffered witness would bring to bear on the issue without relying upon any particular label or fact, and must determine whether it would aid the trier of fact in reaching a decision." *Id.*

Rich & Rich hired Davis to testify about: "whether and to what extent the Defendants were required to and should have marketed the Partnership CD, and what the results of such marketing could have and should have been." R. 135 at 7. Davis is qualified to testify about these issues and would aid the jury in reaching a decision on Rich & Rich's claims. Davis has 25 years of experience in marketing. *See* R. 135, Ex. B (Davis's resume). From 1977 to 1982, she worked for Colins Advertising, a thoroughbred broker and advertising agency. *Id.* She researched thoroughbred families to prepare pedigrees for buyers. *Id.* From 1982 to 1984, she marketed equine insurance to the southern California market. *Id.* From 1985 to January 1991, she was the media director for an advertising agency, Ad-Success. *Id.* There, she led a multi-million dollar marketing and media department. *Id.* In January 1991, she founded One Alliance Communications, a Lexington, Kentucky-based advertising agency that specializes in marketing and branding. *Id.* She still owns and operates One Alliance. *Id.* Her agency has represented

nearly 350 clients in various industries, including business-to-consumer, business-to-business, medical, government, association, and non-profit. *Id.* She has also: served on the national board of the American Advertising Federation, been president of the Lexington Advertising Club, been marketing chair of the Women Leading Kentucky, and received various awards for her marketing and advertising work. *Id.* During her 25-year career, she has taken courses in marketing and advertising through the American Advertising Federation. *Id.*

Her testimony at the *Daubert* hearing supported the conclusion that she is qualified to be an expert in this case. Transcript ("tr.") at 2-10. She testified that she had completed well over 1000 marketing plans. *Id.* at 5. She described in detail the four parts that make up a marketing plan. *Id.* at 7-9. The principles that go into the creation of a marketing plan, she said, are not industry specific. *Id.* at 10. Though she has no experience in the music industry, she has marketed for UK athletics. *Id.* at 6, 12 ("my research specific to UK basketball and UK sports has helped me understand the breadth and depth of the UK basketball fan base here in Kentucky."). Hence, she also has experience marketing to the demographics that would be targeted for Rich & Rich's album.

The opinion of someone with her extensive experience in marketing and advertising would aid a jury in deciding "whether and to what extent the Defendants were required to and should have marketed the Partnership CD, and what the results of such marketing could have and should have been." R. 135 at 7. Poetman did not disagree with the Court's statement that "[Davis is] clearly qualified to say what would happen in the industry if someone was contracted

to market a product."[1] Tr. at 76-77. Accordingly, Poetman's motion to exclude is denied on this ground.

Poetman argues that Davis is not qualified because she has no work experience or educational training in marketing audio compact disks. As described earlier, Davis has qualifications that make her an expert in marketing many types of products, including consumer products, and to the Kentucky market. She does not need to be an expert in the marketing of compact disks to be qualified in this case. More importantly, whether she has the expertise to speak to marketing audio compact disks specifically goes to the weight and credibility that the jury should give her testimony. *Morales*, 151 F.3d at 516 (rejecting the defendants' argument that the district court "impermissibly" allowed an expert to testify beyond the scope of his alleged expertise (quoting *Davis v. Combustion Eng'g Inc.*, 742 F.2d 916, 919 (6th Cir. 1984))); *see also First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001). In *Morales*, the district court concluded that the expert was qualified to opine on motorcycle safety. *Id.* at 515. The defendants argued that the district court "impermissibly" allowed the expert to testify about accident reconstruction, engineering, and child psychology. *Id.* at 516. Because defense counsel cross-examined the expert on his qualifications and the jury was instructed to determine the weight and credibility of the expert's testimony, the district court properly permitted the expert's testimony on these other areas. *Id.* Similarly here, the defendant argues that Davis will testify about a product outside her marketing expertise. Because she is qualified as a marketing

---

[1] Poetman maintained that "the focus of [its] motion was to her sales projections." Tr. at 76-77.

5

expert, it is the jury's job to determine how credible an expert she is on marketing audio compact disks. *Id.* At trial, opposing counsel may cross-examine the expert about whether she is testifying beyond the scope of her expertise. *Id.*

Poetman erroneously cites the standard for qualifying an expert in patent cases, which is not at issue here. *See Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351, 1360-61 (Fed. Cir. 2006). In *Flex-Rest*, the expert was to testify about whether a patent was invalid due to anticipation or obviousness. *Id.* His testimony was excluded because the district court concluded that the plaintiff's expert was not "one skilled in the art of the invention." *Id.* That standard is specific to patent law. The defendant was alleging that prior art anticipated or made the patent obvious to a person of "ordinary skill in the art." *See Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, ___ F.3d ___, 2010 WL 1508205, at *9-10 (Fed. Cir. 2010). That standard—what was known to a person of ordinary skill in the art—is not an issue here, because there are no claims that prior art anticipated or made a patent obvious. Thus, *Flex-Rest* is inapposite.

Davis is qualified based on her extensive experience in marketing. Thus, Poetman's motion to exclude her opinion on this ground is denied.

## II.    Reliability

Under Fed. R. Evid. 702, a qualified expert with specialized knowledge may give her opinion if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rich & Rich has not shown that Davis used a reliable

6

methodology in calculating the sales projections for 1998-2009.

Under *Daubert's* gatekeeping requirement, the Court must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). In *Daubert*, the Supreme Court identified several factors that may determine whether an expert's opinion is reliable: (1) whether the theory or technique used can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error and the existence of standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance in a relevant community. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 n.5 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 594). These questions from *Daubert* do not relate exclusively to scientific testimony; they can also help evaluate the reliability of experience-based testimony, like Davis's. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999). This "flexible" inquiry focuses "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. Rich & Rich, as the proponent of Davis's testimony, must establish by a preponderance of the evidence that the testimony is admissible. *See Nelson*, 243 F.3d at 251 (citing *Daubert*, 509 U.S. at 592 n.10).

Poetman argues that Davis's sales projections are unreliable for two reasons: (1) they are unsupported estimates, and (2) Davis presumes that every adult in Kentucky is a fan of Kentucky basketball, a fan of UK Pep Band music, and a potential buyer of the Rich & Rich album. Poetman is correct that Davis's sales projections are unreliable and, hence, her opinion on this

7

issue is excluded.

### A. Sales projections

In her supplemental report, Davis projects what the sales for the Rich & Rich album would have looked like if Poetman had "prepared a formal marketing plan, developed sound messaging, and executed the marketing plan well:"

| Year | Albums Sold | Change from Previous Year |
| --- | --- | --- |
| 1998 | 60,000 | N/A |
| 1999 | 61,500 | +.025% |
| 2000 | 63,037 | +.025% |
| 2001 | 64,613 | +.025% |
| 2002 | 66,228 | +.025% |
| 2003 | 67,884 | +.025% |
| 2004 | 69,581 | +.025% |
| 2005 | 71,320 | +.025% |
| 2006 | 73,103 | +.025% |
| 2007 | 74,880 | +.025% |
| 2008 | 59,904 | -20% |
| 2009 | 53,913 | -10% |

R. 121, Ex. 3. Davis concludes that 60,000 albums should have been sold in the first year of sales, 1998, by estimating that 2% of the three million adults in Kentucky would buy the album. *Id.* She also assumes that a "competitive product" would not enter into the market. R. 121, Ex. 3.

Davis provides no evidence, in her report or affidavit, to show that her opinion is reliable under the *Daubert* factors. She states in her affidavit that 2% is a "standard industry number used as a base floor sales figure for any marketing endeavor." R. 135, Ex. C at 3. She also points out that she considered the "generally accepted principles of developing and executing a marketing plan." *Id.* The "industry number" and "generally accepted principles" that Davis

8

claims she applied could be evidence that her method of projecting sales enjoys general acceptance in the marketing community, one of the *Daubert* factors. But she does not state where the 2% industry number comes from or what the marketing principles are. She does not mention why she believes sales will grow .025% each year for nine years. She even admits that she did "not consult any treatise, textbook, or any other source of marketing information" in forming her projections. R. 131, Ex. C at 3. In short, she provides no corroboration in her affidavit or report that her methods are generally accepted.

None of Davis's testimony at the hearing showed that the 2% number she used was reliable. When asked, Davis stated that the 2% number comes from the Direct Marketing Association ("DMA").[2] Tr. at 17 ("That number comes from the analysis of thousands of marketing campaigns and direct response campaigns that have been conducted by companies and organizations around the county, including several Fortune 100 companies. The organization that collects this data is called the Direct Marketing Association, or the DMA. They are the largest organization of their kind in the world."). The DMA publishes response rate trends for, among other things, direct mailing and catalogs. *Id.* at 19. At the hearing, Rich & Rich admitted a document that purportedly summarized the DMA's findings for response rate trends in 2004-2009. Rich & Rich Ex. 2. Davis claimed that the DMA's findings "[told her] that a response

---

[2] The parties dispute whether the contract contemplated the type of direct mailing and other marketing incorporated in the DMA's findings. *See* Rich & Rich Ex. 2. While the Court considers whether the summary of the DMA's findings shows that Davis's sales projections are reliable, this does not mean that the contract necessarily contemplated such marketing. Because the limited question here is whether Davis's supplemental report is reliable, there is no need to determine if direct marketing was required under the terms of the contract.

9

rate of 2 percent is viable for any marketer who is put in charge of marketing a product." Tr. at 21. She claimed that she did not cite the DMA—or any other authority for that matter—in her supplemental expert report because she believed it was "common knowledge in the industry that 2 percent is the benchmark response rate." *Id.* at 18. Even if she had cited the DMA's findings, they are so broad that the findings can hardly support a conclusion that Davis's projections are reliable. Davis conceded that she did not consider in her projections that the DMA compiled statistics from 1,252 industries. *Id.* at 71-72. Davis admitted that certain industries will have different response rates. *Id.* at 71. The DMA's findings cannot serve as a basis to make reliable sales projections of Rich & Rich's album. To the contrary, the broad data set underlying the DMA's findings calls the reliability of Davis's projections into further question.

Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)); *see also* Fed. R. Evid. 702 advisory committee's notes (amended 2000). Here, there is no way to know why Davis applied the 2% sales figure to compact disk sales or the Kentucky market. Rich & Rich is asking the Court to take a large, logical leap of faith based on Davis's reputation. It is true that Davis was not required to cite to a treatise or other opinions, but she needed to show how these projections are reliable. Davis could have shown from her experience how these projections are generally accepted. Instead, she simply says her projections are the industry standard and based

on accepted marketing principles. That does not make her opinion reliable.

Her projections are also unreliable, because she provides no evidence on: (1) whether her theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; or (3) whether her technique has a known or potential rate of error and the existence of standards controlling its operation. Hence, all four of the *Daubert* factors favor finding her projections to be unreliable.

Likewise, Davis did not account for obvious alternate explanations in her projections. "The Advisory Committee notes to the Federal Rules of Evidence instruct the Court to consider 'whether the expert has adequately accounted for obvious alternate explanations.'" *Cooper v. Brown*, 510 F.3d 870, 948 (9th Cir. 2007) (quoting Fed. R. Evid. 702 advisory committee's note). Davis did not account for how the music industry has changed from 1998 to 2009. There is no question that music sales have moved away from compact disks because of both legitimate and illegitimate downloading from the Internet. Yet, Davis projects that sales for the Rich & Rich album will increase .025% each year from 1998 to 2007.[3] She does not make any reference to how the Internet's rise during this time period affects those sale projections. This alternate explanation should have been addressed.

Davis was not surprised that compact disk sales decreased by 60% from 1998-2008. *Id*.

---

[3] Davis testified that she assumed the sales would increase .025% each year because the product would change over time (in both content and media form). Her testimony begs the question whether her projections are relevant since Poetman only marketed the album. Davis admitted that Rich & Rich would change the product—not Poetman as the marketer. *Id.* at 30. Since Poetman failed to raise this objection, the Court takes no position on whether the projections are relevant.

at 48. But nothing in the record explains why it is reliable to assume the sales would increase by .025% each year from 1998 to 2007. This projected increase contradicts the undisputed fact that people moved away from compact disk use between 1998 and 2007. *See, e.g.,* R. 139, Ex. 1. Davis did not account for this contradiction and the reliability of her sales projections is even more suspect for that reason.

Davis's projections decreased in 2008 and 2009 because of an economic recession. Tr. at 22. But Davis did not similarly account for the 2000 recession in her projections. *Id.* at 62. This reveals another alternate explanation she failed to consider.

Further, over the eleven-year projection, Davis concludes that Rich & Rich should have sold 785,963 copies of the album. Assuming three million adults live in Kentucky, Davis projected that by 2009 roughly one in four adults in Kentucky would have bought the album. Davis did not consider that nearly half of Kentucky's households would have bought the album under her projections. Tr. at 57-59. This basic limitation on the demand for the Rich & Rich album should have been considered.

Likewise, Davis did not account for the fact that albums like Rich & Rich rarely sell at such high volumes. In fact, Davis does not show that any similar product has reached that high a level of sales. Davis dodged the issue and contended that no product is similar to the Rich & Rich album. Tr. at 46. Even if the album was so unique, her statement does not show that her projections are reliable.

There is a dearth of evidence to corroborate Davis's projections. Accordingly, her sales projections are unreliable.

## CONCLUSION

Though Davis is qualified to be an expert in this case, her methodology of calculating sales projections is unreliable. Thus, the sales projections in her supplemental report—as well as any related declarations or proffered testimony concerning the projections—are excluded. She is permitted to testify about the other parts of her reports that were not explicitly excluded in this opinion. Accordingly, it is **ORDERED** the Poetman's motion to exclude, R. 121, is **GRANTED IN PART** and **DENIED IN PART.**

This the 18th day of May, 2010.

Signed By:
*Amul R. Thapar* AT
United States District Judge